City National Bank v. Commissioner.
City Nat'l Bank v. Commissioner
Docket No. 26610.
United States Tax Court
1952 Tax Ct. Memo LEXIS 245; 11 T.C.M. (CCH) 411; T.C.M. (RIA) 52112; April 23, 1952
*245 The cost of tuck pointing, where needed, and cleaning two exterior walls of petitioner's bank building was a repair item, deductible as an ordinary and necessary expense, and not a capital expenditure, recoverable through depreciation allowances. John W. Stewart, Esq., and Philip G. Johnson, C.P.A., 1224 Sharp Bldg., Lincoln, Neb., for the petitioner. Frank M. Cavanaugh, Esq., for the respondent. RICE
Memorandum Findings of Fact and Opinion This proceeding involves deficiencies in income and excess profits taxes for the calendar year 1945 in the respective amounts of $409.39 and $6,808. The sole issue is whether an expenditure of $6,515, representing the cost of repointing a brick building, is a repair item, deductible as an ordinary and necessary business expense *246 of the taxable year, or, is a capital expenditure, recoverable through depreciation allowances. The other issues raised by the pleadings were conceded by petitioner. Some of the facts were stipulated. Findings of Fact The stipulated facts are so found and are incorporated herein. The petitioner is a National Bank organized under the National Banking Act. The tax returns for the period here involved were filed with the collector of internal revenue for the district of Nebraska. On December 1, 1944, petitioner purchased a three-story brick and stone building for a consideration of $85,000. This building was a combination bank and office building and was occupied by petitioner and other tenants. The building, approximately 25 years old when petitioner purchased it, is a corner property with only two outside walls. One wall of the building has a street frontage of about 44 feet; the other wall has a street frontage of about 90 to 100 feet. Prior to purchasing the building petitioner had been a tenant therein for about four years. After the purchase petitioner made no changes in its quarters or in the quarters of the other tenants in the building. At the time of purchase petitioner's *247 officers were not aware that the outside walls were in need of tuck pointing. There were no signs of water leakage in the interior of the building. About 30 days prior to September 7, 1945, a contractor by the name of Sivadon approached the petitioner, seeking a contract to clean and tuck point the two outside walls. After determining that the work should be done, and that Sivadon's prices therefor were reasonable, the petitioner and Sivadon, on September 7, 1945, entered into a contract, whereby Sivadon agreed to clean and tuck point the two outside walls of the bank building for the sum of $6,515. The pertinent provisions of their contract read as follows: * * *
"Remove all the loose and decayed parts of mortar and surface also dirt deteriorations etc. from above mentioned surface Selica Blasting Method, to which will clean, surface, and leave surface conditioned for the application of Tuck Pointing. At the completion of said cleaning, refill, or Tuck Point all mortar joints of brick and stone with depression of 1/16 inch or more with a high grade cement water tempered (hand tool pressure method). "It is understood by and between two parties, that all work is to be done *248 in a mechanical like manner and the above mentioned surface is to have the appearance, heat and weather resisting condition of new. "Sivadon agrees to furnish all equipment, material, and labor for the sum of - Cleaning and resurfacing
$3,865.00
"Tuck Pointing
$2,650.00
$6,515.00"
* * *
Sivadon completed the work required by the contract about October 24, 1945. He was paid the contract price of $6,515 during 1945. The work performed under the contract consisted of cleaning the surface of the walls of dirt, stains, and loose or decayed parts of mortar by the sand blasting method. After the walls were cleaned the mortar joints between the bricks which had a depression of 1/16 inch or more were refilled, or tuck pointed, with a high grade cement water tempered mortar applied by the hand tool pressure method. It was not necessary to tuck point each head joint and bed joint of each brick in the outside walls, which is referred to in the trade as a solid job of tuck pointing. The tuck pointing work performed by Sivadon was a patch job and not a solid job of tuck pointing. No bricks were replaced by Sivadon and the outside walls were not resurfaced or waterproofed. *249 The purpose of tuck pointing is to prevent premature depreciation by keeping water, ice and snow out of the joints between the bricks. Tuck pointing does not add to the normal life of a building; it enables a building to have a normal life. Tuck pointing does not alter the building so it can be put to a new or different use nor does it appreciably increase the value thereof. The amount expended by petitioner in the taxable year in cleaning and tuck pointing the outside walls of its bank building was a repair item deductible as an ordinary and necessary business expense. Opinion RICE, Judge: Section 23 (a) of the Internal Revenue Code authorizes a taxpayer to deduct all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on its trade or business. In this case petitioner deducted the cost of cleaning and tuck pointing its bank building as an expense chargeable against its 1945 income. Petitioner contends that the work done did not add materially to the value of the building and did not appreciably prolong its life, but served only to keep it in an ordinarily efficient operating condition, as provided in respondent's regulations. *250 Reg. 111, section 29.23(a)-4. [1] Respondent contends that the expenditure was capital in nature, and relies upon that portion of the same regulations which states that repairs in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the life of the property, should be charged against the depreciation reserve. * * *." The distinction between repair items and capital expenditures was discussed in Illinois Merchants Trust Co., Executor, 4 [*] A. 103 (1926). There, as here, the parties relied on different sentences of the applicable regulations. The pertinent portion of that opinion states, *251 p. 106: "It will be noted that the first sentence of the article [Article 103 of Regulations 45] relates to repairs, while the second sentence deals in effect with replacements. In determining whether an expenditure is a capital one or is chargeable against operating income, it is necessary to bear in mind the purpose for which the expenditure was made. To repair is to restore to a sound state or to mend, while a replacement connotes a substitution. A repair is an expenditure for the purpose of keeping the property in an ordinarily efficient operating condition. It does not add to the value of the property, nor does it appreciably prolong its life. It merely keeps the property in an operating condition over its probable useful life for the uses for which it was acquired. Expenditures for that purpose are distinguishable from those for replacements, alterations, improvements or additions which prolong the life of the property, increase its value, or make it adaptable to a different use. The one is a maintenance charge, while the others are additions to capital investment which should not be applied against current earnings. * * *" Recent cases weigh and consider the same factors *252 in determining whether an expenditure is a repair item or a capital outlay. Pierce Estates, Inc., 16 T.C. 1020 (1951); Farmers Creamery Company of Fredericksburg, Virginia, 14 T.C. 879 (1950); Midland Empire Packing Co., 14 T.C. 635 (1950); American Bemberg Corporation, 10 T.C. 361 (1948); affd., 177 Fed. (2d) 200 (C.A. 6, 1949); Buckland v. United States, 66 Fed. Supp. 681 (D.C. Conn. 1946). Respondent's theory is that the work done under the contract was so extensive that the entire exterior wall surface of petitioner's bank building was restored, and that such expenditure so arrested deterioration and appreciably prolonged the useful life of the building as to exclude it from the Code concept of an incidental repair item. We cannot agree with respondent's theory. The evidence clearly establishes that the expenditure was for the purpose of keeping the property in an ordinarily efficient operating condition. The removal of loose and decayed mortar and the refiling of the depressions with new mortar was not an alternation, replacement, improvement or addition to the building in its ordinary sense. It was *253 a mending or a restoration of the walls to a sound state. We also disagree with respondent's theory that there was a "cleaning and resurfacing" of the walls by sand blasting. This operation removed some of the losse and decayed mortar from the wall surface, and removed dirt and stains therefrom. Naturally, the cleaning enhanced the appearance of the building, but it did not prolong the life of the building or increase its value, or make it adaptable to a different use. The cost of cleaning the building was a maintenance charge which "merely keeps the property in an operating condition over its probable useful life for the uses for which it was acquired." Illinois Merchant Trust Co., supra. In view of petitioner's concessions as to other adjustments made by the respondent Decision will be entered under Rule 50. Footnotes
1. REG. 111, SEC. 29.23(a)-4. REPAIRS. - The cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating condition, may be deducted as expense, provided the plant or property account is not increased by the amount of such expenditures. Repairs in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the life of the property, should be charged against the depreciated reserve if such account is kept. * * *↩